■ ANGELO BELLOCCHIO, Appellant, v 783 BECK STREET HOUSING DEVELOPMENT FUND CORPORATION et al., Respondents, et

al., Defendant. [760 NYS2d 144] —Order, Supreme Court, Bronx County (Gerald Esposito, J.), entered September 27, 2001, which, to the extent appealed from as limited by the brief, granted defendants-respondents' motion and cross motion for summary judgment dismissing the complaint as against them, affirmed, without costs.

Plaintiff allegedly was injured while fending off an attack by two dogs in the basement of a building owned by defendant 783 Beck Street and managed by defendant Banana Kelly Management. The owner of the dogs, defendant Angel Nieves, was the building superintendent. Insofar as the complaint sought imposition of absolute liability on these defendants for the dogs' behavior, it was properly dismissed since plaintiff, in response to defendants' prima facie showing that they neither had nor should have had prior notice that the dogs possessed vicious propensities, failed to come forward with evidence sufficient to raise a triable issue (*see Carter v Metro N. Assoc.*, 255 AD2d 251 [1998]). Also properly dismissed was plaintiff's claim sounding in negligence, since the circumstances of record do not warrant imposition of the "distinct, enhanced duty" necessary to sustain recovery on such a theory for harm attributable to animal behavior (*cf. Schwartz v Armand Erpf Estate*, 255 AD2d 35, 38 [1999], *lv dismissed* 94 NY2d 796 [1999]). Concur—Sullivan, Williams and Gonzalez, JJ.

Tom, J.P., and Mazzarelli, J., dissent in a memorandum by Tom, J.P., as follows: Although I agree that there is an insufficient basis to impose strict liability arising from the dogs' alleged vicious propensities, nevertheless a prima facie case of negligence is established and the evidence creates factual questions regarding whether the conduct of defendants and their employee was negligent with respect to the dogs and whether such conduct was a proximate cause of plaintiff's injuries. Hence, although I concur in the dismissal of the third cause of action, sounding in strict liability, I would modify to the extent of reinstating the negligence claim in the first cause of action and the regulatory claim in the second cause of action. This latter claim arises out of a regulation that requires an owner to maintain premises in a safe condition under the Multiple Dwelling Law.

Plaintiff is a telephone service technician. Defendants-respondents include the owners and operators of the apartment building at 783 Beck Street, and defendant-respondent Nieves was the superintendent of the building and owner of the dogs.

On September 13, 1999, plaintiff and his assistant, Rafael

Roman, worked for Bell Atlantic. At about 11:00 A.M. on that date, they responded to a building resident who requested the installation of telephone service. Plaintiff at this time had been a service technician for about 10 years. As a service technician, he installs and repairs telephone lines. As part of that job, he routinely enters people's homes, climbs poles and, as is presently relevant, enters basements to make the necessary connections. Plaintiff had never been in this building before. After responding to the customer, plaintiff and his assistant went to the basement to locate the telephone wires and make the appropriate installation so that the customer would receive a dial tone. They entered the basement by elevator. No key was required to operate the elevator. Upon exiting the elevator at the basement level, they went to look for the feeder box which, plaintiff explained in deposition testimony, is usually found by following telephone lines. However, he could not locate the telephone lines, and they turned left down a hallway toward a door. However, he never made the door, and only proceeded about five feet when they heard dogs around a corner to the right of the elevator. Plaintiff estimated the distance as about 10 feet away. At this point, the dogs would have been behind them, insofar as they had turned left upon exiting the elevator. Plaintiff testified that he had not known there were dogs on the premises and, if he had known, he would not have entered the basement. As soon as they heard the dogs, they ran for the elevator. Although the elevator was still stationed in the basement, the door to this old elevator, which had to be manually opened by swinging the door into the hallway, was closed. Plaintiff's assistant managed to get back into the elevator. However, before plaintiff could get inside the elevator, the dogs were right on plaintiff. He described them as large pit bulls, one weighing about 60 or 70 pounds and the other weighing about 40 or 50 pounds. There did not appear to be anyone else in the basement at this time. Plaintiff managed to kick a nearby bucket at the dogs and to grab a mop with which he tried to fend them off. At this point, the dogs were in front of the elevator's entrance, which prevented plaintiff's escape. One dog snapped the mop handle, taking the mop head right off the stick, and the other dog lunged at him and seized his pant leg. At this point, plaintiff thought that they were trying to "maul [him] to death," and that it was "an all out fight for my life with these two dogs." With the remnant of the mop handle, he hit the dogs several times until the stick broke, but they knocked him down, and kept knocking him down each time he tried to get up. Although they grabbed hold of his clothing, tearing his shirt, pants and tool belt, he managed to keep

them from biting his flesh. As he fell, he knocked over a refrigerator and garbage cans. As plaintiff was being backed against the door at the end of the hallway, his assistant was trying to distract the dogs by throwing tools at them. After falling several times, and trying his best to keep the dogs from getting around him, plaintiff managed to push them back far enough so that he could jump into the elevator, where he collapsed. The assistant called police and an ambulance by cell phone.

Later, plaintiff went back to the building to take pictures. The superintendent was not available. The building porter escorted plaintiff back to the basement, though the porter first ensured that the dogs were locked up. The porter indicated that Con Edison's union representatives had been there recently, to ensure building safety for union members, as a consequence of plaintiff having been attacked by the dogs.

Victor Rivera, a property manager for defendant Banana Kelly, who had been responsible for supervising the superintendent, also testified. Rivera remembered that he had received complaints about superintendent Nieves' dogs' noise and feces in the back alley leading to the basement and told Nieves, a few days before this incident, that the dogs had to be removed. Rivera had been in that location once, and could hear the dogs barking behind a door. Nieves eventually was fired because of the dogs.

Nieves testified that he personally trained these American bulldogs using information from books. He testified that they were not pit bulls, insofar as pit bulls are trained to fight and are "meaner" than bulldogs. He was unaware of the history of one, and got the other as a puppy. Nieves claimed that the basement could not be accessed by elevator unless the key to the elevator was obtained from him, and that no one was allowed into the basement unless accompanied by him. However, he also testified that he occasionally left the key switch in an on position to allow the building's contractors easy access to the basement. Before the date of the incident, he had never been asked to assist telephone service personnel to gain access to the basement. Typically, if utility personnel or contractors are in the building, he is told by the manager's office. His own office, which is to the right of the elevator as one exits into the basement, also has a door going to the courtyard outside of the building, and he can be notified by ringing the bell on this outside door. However, during the day he may be in various locations throughout the building. Tenants usually contact him by knocking on his 6th floor apartment door. Nieves described

the basement as large, consisting of about 12 rooms. The boiler room, other machinery and company supplies were kept there. However, there was no laundry room, and no reason why tenants would want to access the basement, so that he did not consider it to be a public access location. He kept the dogs in a complex of rooms to the left of the elevator (contrary to plaintiff's testimony that their unfettered attack came from the right). The service box for telephone lines was positioned right in front of the elevator as one exited there on the basement level. The main passage from the lobby entrance of the building to the elevator did not have any signs warning of dogs. However, as the elevator door opened on the basement level, the outer door had a sign, indicating the presence of dogs. There was also a sign indicating dogs on the outside of the basement door leading outside to the courtyard. Around the time of the incident, painters were working in the area and would have taken down signs for that purpose, but Nieves did not recall that such was the case on the day of the incident. No one ever told him that he was not allowed to keep pets in the building, and he had received permission to do so from a prior supervisor, Frederico Nunez, when Nieves was hired. He initially kept them in his apartment, but brought them to the basement as a deterrent to theft; thieves often broke into the back door during the tenure of the prior superintendent, and Nunez even remarked favorably on the dogs' presence in this regard. Since he had had the dogs in the basement, there were no attempted break-ins or other thefts. Nunez had been fired by the time of this incident. The replacement supervisor, Bill Rodriguez, knew that Nieves had dogs. Nieves described the dogs as playful; they played with children, had never bitten anyone before the present incident, and never growled, though they occasionally barked. On the morning of the incident, Nieves had let the dogs out from their padlocked room into their larger inner room at about 8:00 A.M., as was usual, and put them back into the padlocked room when he finished work at about 4:00 P.M. He regularly saw the dogs during the daytime, insofar as his office was nearby. This incident was on a Friday; no one had told him about it until Monday.

Even if proof of vicious propensities, for purposes of strict liability in tort, is not sufficiently established to survive summary judgment, that does not thereby preclude a negligence theory. Negligence arising from incidents with animals presents a different analytical framework and requires a different quantum of proof. Rather, if a dog bite and damages inflicted are reasonably foreseeable consequences of the conduct forming the gravamen of the complaint, the plaintiff retains a basis

to sue in negligence (*Colarusso v Dunne*, 286 AD2d 37, 39 [2001]). Although the bite itself cannot prove negligence, cumulative factors may suffice. The principle has been long established (*cf. Hyland v Cobb*, 252 NY 325 [1929] [negligence relying on violation of ordinance regarding care of dogs in public places inapplicable in private park]). For negligence, there may not even be any record proof that the dog was vicious (*Colarusso, supra*). Rather, the plaintiff is required to show a duty of care owed to him by the defendants and a breach of that duty by failing to take reasonable measures to prevent injury arising from particular conduct, whether that breach proximately caused the injuries and whether the injuries are a reasonably foreseeable consequence thereof. Thus, the focus is on whether the plaintiff's action and the dogs' response were sufficiently foreseeable to put the defendants on notice that such an encounter might be anticipated (*Colarusso* at 40).

The evidence established thus far creates unresolved factual issues underpinning the negligence claim. The negligence theory is predicated on the superintendent's conduct, and the manager's and owner's alleged acquiescence in or approval of such conduct, whereby Nieves kept these particular bulldogs on residential premises, as well as the manner in which they were maintained and restrained so as not to attack business invitees. Arguably, if there were no signs or other warnings, a jury might find the existence of a latent danger on the premises. Nieves' testimony sharply conflicts with plaintiff's evidence regarding the accessibility of the basement, the location of the dogs and their segregation behind a closed door, and the existence and location of warning signs. The evidence is also inconsistent regarding the dogs' propensities. Even if not rising to viciousness as a matter of law for purposes of this motion, they nevertheless possess different personalities depending on whether plaintiff's or Nieves' testimony is credited. Nieves' averment of the docile nature of these dogs is belied by the animals' immediate and ferocious attack on plaintiff and the fact that they were used as guard dogs. One may surmise that bulldogs maintained as guard dogs are not going to act playfully when a stranger enters their domain. These dogs were placed there to guard against intruders. If Nieves had knowledge of the unfriendly nature of these animals, then adequate steps should have been taken to keep them away from the general public. This, though, is the very sort of factual issue to be evaluated at trial along with conclusions to be derived therefrom (*cf. e.g. Panzer v Harding*, 118 AD2d 842 [1986] [undisputed trial testimony demonstrated dog was consistently gentle]). Nieves' testimony regarding his daily routine also

seems inconsistent with plaintiff's evidence regarding that day's sequence of events. Nor does it explain why he never found out about a noon time attack until the following Monday, if he maintained regular control over the dogs.

Nieves' testimony also conflicts with that of the building management company regarding whether he was allowed to keep dogs in the basement, and, if so, for what purpose. There also are unresolved issues regarding the procedures, if any, to be taken by business invitees when they enter the premises and before they enter the basement. Although Nieves testified that he did not consider the basement to be a common area, his own impression is by no means dispositive and the ease with which the service technicians entered the basement—the location where they could expect to locate the necessary telephone wires—seems to belie Nieves' impression. It appears that the basement level was accessible to anyone, at the time of this incident, by mere use of the elevator. In any event, these are matters that require resolution at trial. If plaintiff's evidence were taken as true, then the question arises why guard dogs were allowed to roam this common area where, by Nieves' own testimony, contractors regularly entered, and why the dogs were apparently unrestrained and unsupervised (at least on the occasion of the incident). Hence, I conclude that a prima facie case of negligence is established, and that plaintiff is entitled to a trial.